In the matter of proceedings for the improvement of Brooklyn Heights.

Even assuming that it would be competent and lawful for the city of Brooklyn to take lands for a public street or highway, on the payment of a nominal sum therefor, upon the ground that the original proprietors had dedicated the same to that purpose, it does not follow that they can be appropriated, and that the title thereto can become vested in the city, as "public places," under the act of April 17, 1866, "for the improvement of the Brooklyn Heights."

When such proprietors declared their willingness to dedicate their property to the purposes of a street, whenever the public authorities would accept the dedication, the property, nevertheless, continued subject to their control and absolute enjoyment until such acceptance was made.

In determining the value of land thus taken, it is proper for the commissioners of estimate to take the fact of such dedication, and the probability of its future acceptance, into consideration; and if the property is thereby depreciated, the amount of the depreciation may be properly deducted from what would otherwise have been the fair, full value thereof. But it is erroneous to allow a nominal compensation, only, to the owners.

THIS is a proceeding, in connection with four others, under an act of the legislature, entitled "An act for the improvement of the Brooklyn Heights," passed April 17, 1866, to take the lands which, in the language of the act, " would be in Middagh street, upon the opening thereof to Furman street, and lying between Columbia and said Furman street," for a public park. The property is fifty feet wide by about one hundred and sixty feet deep, is situated at the most precipitous part of the Heights, and is now, and always has been, practically impassable. Upon the western portion of the land are two brick buildings, each two stories high, one about twenty by thirty feet, the other about twenty-two by fifty feet. Valuable fences, walls and trees, have been placed on the property, and it has, to some extent, been filled in with earth. The commissioners awarded the owners of the fee of these lands and improvements six cents damages. This award of nominal damages was made upon the theory that the present interest of the owners of the fee is " an estate in fee, subject to dedication to use as a public street and servitude as

a street." It is not disputed that the value of the property to be thus taken was $16,000. On presenting the report of the commissioners of estimate, dated September 15, 1866, together with their additional report made October 23, 1866, the court, at special term, formally affirmed the said report, without expressing any opinion upon the questions raised. From that decision the owners appealed.

*G. T. Jencks, J. M. Van Cott* and *Ludovic Bennett,* for the appellants. I. The true rule of compensation, in this case, is to award the owners in fee of the land to be taken, the true and full value of their interest in the lands with the improvements. To ascertain the value of their interest, it is first necessary to determine what is that interest. It is not denied that if these lands were originally dedicated to the public use as a street; and the public have not lost or surrendered their rights to accept the grant ; and this were a proceeding by the public in its corporate character as the city of Brooklyn, to open the said street in acceptance of the original dedication, the grantees of the original dedicators, the present owners of the fee, would be entitled to only nominal damages. But—1. It is doubtful if there were originally any dedication. 2. If any, it is certain that the public never accepted it, and that their right to accept it has been lost or abandoned ; and 3. This is not a proceeding to accept the dedication and open the said street, but a proceeding to take the whole property, both the fee and the alleged easement, for a purpose never contemplated by the original proprietor and supposed dedicator of the land, and in complete violation of it, to wit, to take the lands for public parks and vest the title thereto absolutely in the city.

II. A way which terminates upon a private close, and is, therefore, not a *thoroughfare,* cannot be made a highway by dedication. (*Holdane* v. *The Trustees, &c. of Cold Spring,* 21 *N. Y. Rep.* 474.) The ancient form of indictment always

showed both the termini of a public highway ; and the reason
was that if the way did not lead from town to town it was
not a highway.  Lord Mansfield, Ch. J.  " I am of the opinion
that this did not amount to a dedication ; that a *cul de sac*
could not be dedicated as a highway." (*Woodyear* v. *Had-
den*, 5 *Taunt.* 125. *Woolr. on Ways*, 11.)  No case has been
found, and it is believed there is none, in either the English
or American books, which decides that lands *over* and beyond
which the public cannot lawfully pass can be dedicated to the
public use as a street or highway.  To be a highway it must
have a place of lawful exit, as well as of entrance.  In the
case at bar, the lands west of Columbia street, included
within the lines of the proposed Middagh street, were a *cul de
sac*.  They ended at a precipice, and at the boundary line of
other lands owned by and in possession of parties other than
the dedicators.  This fact appears by the maps in this case,
and also in the *Furman street case*, (17 *Wend.* 649.)  It also
appears in an examination of the Hicks map of 1806 itself.
The lines of Middagh street are carried to the river, but it
appears by the scale on which the map is projected, that the
western line of the Hicks property was really about 160 feet
west of Columbia street, and being about the present easterly
line of Furman street.  Other persons owned the land from
this line to the river shore.  Furman street was not opened
until 1836.  Thus for thirty years after this supposed dedi-
cation, these lands were closed at their western boundary,
and could not be passed over, or entered from the west by the
public, without trespassing upon the lands of the owners be-
yond.  The map of the village of Brooklyn, in 1816, adopting
the Hicks map for the street lines, therefore, could not extend
Middagh street to the water, on the supposition of a dedica-
tion by the Hickses.  For thirty years, therefore, there could
have been no public user of this land ; and, subsequently,
Middagh street was opened by the authorities, but not west
of Columbia street.  Which act is by implication a denial

In the matter of Brooklyn Heights.

or renunciation of any right to accept the alleged dedication of this land. (17 *Wend.* 649, *supra. Proceedings for Opening Middagh Street, and Furman Street, filed in the Street Commissioner's office.*)

III. The original dedication merely granted to purchasers of lands bounded by the proposed streets, private rights of way. The public easement is worked out through these private rights, and must be established by the corporate authorities during their existence. This enlargement of the private into a public easement secures the private rights of the landowners, which might otherwise be lost, and places the duty and burthen of maintaining the way on the public. From it springs the rule for the award of nominal damages to the dedicator on the acceptance of his grant.

But (1.) if the public do not accept the dedication before the extinguishment of the private easement, it cannot do so afterward. With the loss of the private easement, the public right to accept the dedication is extinguished. (2.) The private easement may be lost by an adverse possession, as where one enclosed a part of the land dedicated and held exclusive possession thereof for twenty-five years, he gained a valid prescriptive title to the same, and the private easement was lost; or by a release of the private rights by all the owners thereof. (*Alvey* v. *Town of Henderson*, 16 *B. Monroe*, 131, 172. *Rowan* v. *Portland*, 8 *B. Monroe*, 232, 247. *Baldwin* v. *Buffalo*, 29 *Barb.* 396.) (3.) The public have never accepted this dedication; and (4.) The grantees of the private rights of way have long since lost their easement by an adverse exclusive possession of over twenty years.

IV. The dedication does not subject the lands to the public servitude as a highway, unless the dedication is accepted by the public authorities. To constitute a good dedication there should be an intention and an act of dedication on the part of the owner, and an acceptance by the public; as soon as these concur, the dedication is complete. (*Washburn on Easements, p.* 139, *ch.* 1, § 5. *Underwood* v. *Stuyvesant,*

19 *John.* 180.   *City of Oswego* v. *Oswego Canal Co.* 2 *Seld.*
257.   *Child* v. *Chappell,* 5 *id.* 246.   *Clements* v. *West Troy,*
16 *Barb.* 251.   *Green* v. *Chelsea,* 24 *Pick.* 71.   *Hemphill*
v. *Boston,* 8 *Cush.* 196, *Shaw, C. J.* 19 *Pick.* 405.   8 *Metc.*
243.   4 *Cush.* 340.   7 *Gray,* 343.   1 *Allen,* 153.)   (1.) There
has been no acceptance of the supposed dedication in this
case by the public, either expressly or impliedly.   The desig-
nation of the site of a street (on maps or in deeds) is not, in
any sense, opening it.   (*Matter of Furman street,* 17 *Wend.*
649.)   The map of the village of Brooklyn, in 1818, was
made for the express purpose of exhibiting the streets, &c.
*to be* laid out, "in order that no resident may plead ignorance
of the permanent plan *to be* adopted for opening the streets,
&c. of said village."   (*Laws of* 1816, *ch.* 95, *incorporating
Village of Brooklyn.*)   The above act authorized the village
trustees to enter upon all lands they shall deem necessary to
be surveyed and *used for laying out, opening, and forming
any street or highway.*   No entry was ever made on these
lands under the above act, or any other.   (2.) The user set
up by the commissioners was not a public user.   It is noto-
rious that the lands at the extremity of Middagh are now,
and always have been, practically impassable, by reason of
their precipitous and dangerous descent.   The public have
never used them as a public way.   The only usage has been
that of stragglers climbing up the heights along the whole
front, without reference to any street lines.   In 1806 there
were no public authorities, no corporation of Brooklyn.   A
few farmers occupied the whole of the site of the present city.
Furman street was opened in 1836.   Until then there could
have been no public thoroughfare over these lands.   They
have been held in exclusive and adverse possession for twenty-
five years.   The act of April 8, 1834, ch. 92, section 50
(charter of city of Brooklyn) does not apply to streets in the
first seven wards, unless they had been used, graded and
paved as streets; or, if it did, the user must have been for
ten years *after the passage of that act.*   Of such user the

case shows there was none. (3.) The city of Brooklyn has not only never accepted the dedication, but has repudiated and refused it by the most unequivocal acts. It has for many years taxed these lands for their full value, and received payment of the taxes from the present owners. It has sold the land for non-payment of these taxes, and delivered under the seal of the city, to the purchaser, long leases of the same. April 13, 1843, these lands were sold by the city for an unpaid assessment made thereon for the paving of Furman street from Fulton to Pierrepont streets. The conveyance was delivered July 12, 1845. April 15, 1858, part of these lands were sold for unpaid assessments for fencing Columbia street, between Colonnade Garden and Poplar streets. The fence was put up across the whole of the Columbia street front of these lands, and was built under the authority of an ordinance of the common council. There have been other sales thereof for taxes. The city has formally opened Middagh street west of Columbia. It also has graded, levelled, paved, and generally maintained that part of the street as a public highway, and for over twenty years past it has stood by and seen this property in the exclusive possession of these owners, fenced, improved, filled in and built upon, without objection or interference. Sixty years have elapsed since this supposed dedication, and unless it be a subsisting grant forever, a stronger case of extinguishment of the public right to take the easement could not be made.

V. As to the payment for the improvements on these lands, the owners of the fee had the right to build on and improve the same, subject to the right of the public to *accept the dedication and open the street*, and to then award nominal damages.

VI. If the foregoing premises are established, it follows that the appellants are owners in fee of the lands in question, discharged of any " dedication to use as a public street, or servitude as a street," and would be entitled to be paid the full value of the lands and improvements, were this a pro-

ceeding to open said lands as a street; *a fortiori* in this proceeding they are entitled to such payment.

VII. The city of Brooklyn is not a party to this proceeding. The act creates a board of commissioners whose existence is perpetual. In them and their successors (self appointed) is placed the whole of the powers and duties prescribed by the act. The title only of the lands is to vest in the city, and that not until after the confirmation of the commissioners' report by this court. The owners of this private easement, if any, are not interested in this proceeding. The question of dedication, therefore, could not properly be raised by these commissioners. But the act of 1866, itself, determines the right of these owners to full payment of the value of their lands.

VIII. The act recites that the lands which *would be* in Middagh street upon the opening thereof, and which lie between Columbia and Furman streets, " *are hereby declared to be public places,* and the same shall, when duly opened under this act, be under the control and management of the commissioners," and " the title to said lands shall vest in the said city as public places." The act expressly repudiates and overthrows the original dedication, if any there were. It denies that there ever was such a dedication. It subverts both public and private easements, if any such exist, and in violation of the original dedication takes the lands in fee for a purpose totally different from the intention of the dedicator. The public and private right of way over the land, as a street, are taken away; the old use is destroyed and a new one set up. The lands are to be enclosed and turned into a public park. The legislature has no power to thus appropriate these lands without providing for the payment of the owners in fee of the just compensation for the lands and improvements taken. (*Williams* v. *New York Central R. R.* 16 *N. Y. Rep.* 97. *Presb. Soc. of Waterloo* v. *The Auburn and Rochester R. R.* 3 *Hill,* 567. *Hayward* v. *Mayor of New York,* 3 *Seld.* 314. 7 *Barn. & Cress.* 257.)

In the matter of Brooklyn Heights.

IX. The report should be sent back to the commissioners for correction, with directions to award the appellants compensation in the full value of the lands and improvements of which they are to be deprived by this proceeding.

*Sidney V. Lowell,* (assistant corporation counsel,) for the respondent. I. The premises taken for this improvement are parts of certain public streets in the city of Brooklyn ; being that portion of Pineapple, Orange, Cranberry and Middagh streets, which are on the extreme brow and slope of the Heights of Brooklyn. Being situate on the site of a steep bank, they are not capable of any valuable, practicable use as thoroughfares, but are valuable to all the surrounding neighborhoods as "lookouts" upon the East river and harbor of New York for air and view. The act in question is to put them under the management of a board of commissioners appointed by the act for the purpose of "inclosing, sustaining, grading, planting, and beautifying" them. For the purpose of holding an inquisition as to any damage that there might possibly be to any person by reason of the improvement, and fix the legal right of the public, the commissioners whose report is presented were appointed.

II. The commissioners have awarded certain sums to the owners of certain improved premises immediately adjoining the improvement, for incidental damages, and have found and decided as matter of fact that otherwise than as reported, no damage is sustained by any person, by reason of the improvement.

III. One John J. Merritt, and others, who had obstructed the streets with buildings, &c. have appealed from the report, and make three grounds of objection :

1. Because the land in the streets is reported as being dedicated as streets.

2. That if they were streets, nevertheless they should receive compensation in the same manner as though they were not, as owning it absolutely and unrestrictedly.

3. That the commissioners have not awarded compensation for incidental damages. This objection was raised before the court had finally completed their report, and on the "review" thereof they awarded a sum therefor.

The only questions then are :

1st. Was the land said to be dedicated as a street actually subject to such dedication ? This question, though a good deal of evidence to show its dedication is submitted by the affidavits to sustain the report, is settled by reference to the very deeds by the original proprietors of the land forming the same through which the present owners derive title, which expressly declare that the same are conveyed, each "*as an open street, and as having been used as a street in the said village, and described as such by the said parties of the first part, &c. on maps and in deeds,* and *not, otherwise howsoever.*"

2. Independent of the paper dedication, these streets have become public streets by user. Under the charter of 1834, streets theretofore laid out by the owner of lands through which they ran, and thrown open to the public and used as streets, became public streets for all purposes after they had been so traveled for ten years. It is undisputed that these streets were used as open public streets—open to all the world, from before the year 1816 to subsequent to 1845—nearly thirty years. The provisions of the Revised Statutes, (*section* 99, *title* 1, *chap.* 16, *part* 1st, *p.* 521, *Edmonds' ed.,*) have no reference to the streets of incorporated villages or cities which are opened under special acts, which prescribe different modes of opening and regulating as to each village and city. They apply only to the general system of roads and highways existing throughout the state, leaving the local territory of municipalities to be governed or regulated by their peculiar laws or charters. In the city of Brooklyn, as incorporated in 1834, the streets in the first seven wards, the older part of the city, which had formerly constituted the old village of Brooklyn, were placed

under the power and authority of the common council. (*Laws of* 1834, § 40, *p.* 105.) Over them the city ordinances extended, "whether the same have been or shall be laid out in pursuance of this or any other statute, *or by the mere acts of the owner* or owners of the land through which they may run." (*Section* 49, *p.* 109.) The outer wards of the city, only, were regulated by general statutes, and in that case by a law relating to the counties of Long Island only. (*Id.* § 38.) Therefore none of the systems of streets in the city were opened or regulated under the general state law as to roads or highways, and there were no "commissioners of highways" having authority over the streets of the first seven wards.

They were not subject to discontinuance by nonuser, but in the words of the city charter, "The same shall *forever* thereafter remain and be considered, to all intents and purposes, as a public street of the said city." (*Id.* § 50.) The streets in question are streets in the first ward of the city of Brooklyn ; streets shown on the original plan of the old village ; streets which had been laid out even before the plan was made, and to endure for all time as city streets, not as country roads which might be discontinued by tacit understanding with the "highway commissioners" and at the pleasure of half a dozen farmers whose interests only they conserved. They are the highways of the people. No statute of limitations shields those who unlawfully appropriate them. This has been expressly decided by the Court of Appeals in *Walker* v. *Caywood,* in which case it is held that the only statute of limitations which has any analogy to the case is the provision that roads laid out under the general state law may be closed if discontinued for six years. Which statute does not apply to the streets of Brooklyn. (31 *N. Y. Rep.* 51.) No erection and incumbrance on the streets subsequently placed there was legalized by lapse of time ; obstructions in a public street are nuisances, and the claim-

ants can be indicted for their acts in obstructing the same. (*People* v. *Cunningham*, 1 *Denio*, 524.)

3d. The next question then is, the streets being such, should awards be made to the representatives of the grantees under the preceding deeds, the owners of the naked fee, to the same extent as if the streets were building lots owned by them?

It has been decided over and again that the commissioners in these proceedings are to estimate the value of the land according to the interest the party has in it, whether qualified or not. By the conveyances under which the parties in interest hold, the land is conveyed to them as an "open street" and "not otherwise," and for this qualified interest in the land being of nominal value, the commissioners have made corresponding awards of nominal damages. In the *Matter of Albany street*, Chief Justice Savage says in relation to taking property held as a churchyard by Trinity church : "Can it be right to consider it now as building lots and assess its value as such to the church as advantage? It seems to me the true rule of estimating the damage is *to appraise the property at its present value* to the owner, considering *the extent of the interest* which the owner has and the *qualified rights* which may be exercised over it." (11 *Wend*. 150.) In the matter of *William and Anthony streets*, it was held, (Bronson, J.,) that the lessened value of the property taken, owing to disadvantageous clauses in leases thereof, should be considered. (19 *Wend*. 678. *See also Owners of Ground* v. *Mayor, &c. of Albany*, 15 *Wend*. 374 : *Matter of application of Mayor, &c. of N. Y. for improve't of Nassau St.*, 11 *John*. 77.) The rights of the appellants are altogether decided by the answer to the question, were the premises dedicated as public streets, or not? The commissioners have found, as matter of fact, that there is no increased damage to ensue by taking the premises for the uses of the act for public places or squares, than existed before in the use of the same as thoroughfares, other than what they have allowed as inci-

dental damage to adjoining property. The premises are taken to be used for no other purposes than those to which they were subject before as part of the urban uses of city streets, viz: to be open to the air and view, graded and beautified. In fact the public use is lessened by the same not being subjected to unrestricted travel. But the owner of the naked fee therein is deprived of no use of the land other than what is also taken from the general public. While all other uses of the street remain, he and they may not travel over the same in the more unrestricted manner in which streets may be traveled than parks. While he may be more interested in this use than others, he is also more bene-fitted by the improvement of his adjoining land.

Finally, the premises are not taken "in fee simple abso-lute" (as in the case of *Hayward* v. *Mayor, &c. of N. Y.* 3 *Selden*, 314,) quoted before the commissioners, but pru-dently not referred to on this appeal ; but only for " open " " public places," and with which qualified title as public places only is the city to be invested ; they have not been stricken from the official map of the city as is done in all cases where the streets are meant to be forever obliterated ; the act contains no such provision. They still stand upon the old Hicks' map. They still stand upon the official map of Brooklyn. When they cease to be parks, if ever, they become streets again. The city cannot convert them into building lots, or sell the land.

The appellants' argument, that by a kind of legal somer-sault, caused by this proceeding, the land in the street " re-verts " to them as building lots, has no foundation. They never had or acquired any such title to the land, and the land never was building lots, from the time of the old farm.

The cases relied on by the appellants ( *Williams* v. *Central R. R. Co. &c.*) are suits in trespass and actions for damages, where railroad companies have undertaken to lay tracks and commit other nuisances (held to be such) in front of and along the plaintiff's lands. They are all cases where addi-

tional uses were sought to be imposed upon lands, for the benefit of private corporations, than those to which they were subject as city streets, or country roads, and which were injurious to other lands of the parties plaintiff, without any payment of damages, or any legal inquisition being had according to law, to ascertain whether any person would be damaged thereby. The report follows the precedents of all the other parks in the city, while for the propositions of the appellants there is no precedent whatever.

If the commissioners have erred, the court should point out the error, and send the report back for correction.

*By the Court*, LOTT, J.　Assuming that it would have been competent and lawful for the city of Brooklyn to have taken the lands in question for a public street or highway, on the payment of a nominal sum therefor, upon the ground that the original proprietors had dedicated the same to that purpose, it does not follow that they can be appropriated and opened, and that the title thereto can become vested in the city " as public places," under the act above referred to, without making full compensation for the same. Those proprietors had the right to make such a disposition of their lands as their interests or wishes dictated, and they will be bound to that extent, and no further; and when they declared that they were willing to dedicate the same for the purpose of a street, whenever the public authorities would accept the dedication, the property nevertheless continued subject to their control and absolute enjoyment until such acceptance was made. It is useless to speculate whether the effect or result of appropriating the lands for the purpose of a " public place," in respect to its future enjoyment by the owner, would be the same as if opened for a street, or whether such a use would or would not be productive of greater damages to him than the other; it is sufficient to say that he has not consented to such an appropriation thereof.

The question, then, to be considered is what measure of

In the matter of Brooklyn Heights.

compensation is just and proper to be allowed to the owners of the lands taken for the improvement authorized by the said act. It is established by the proofs introduced before the commissioners that the principal part, if not all, of the lands had been dedicated by parties under whom the appellants claim title, for the purposes of a street. Such dedication has, however, never been accepted by the public authorities ; on the contrary, they have treated the property as private and liable to taxation. The use of it, as stated in some of the affidavits, does not prove an acceptance. It is, therefore, not subject to present existing servitude as a street or highway. It may be that if the act under which the proceeding was taken had not been passed, the city of Brooklyn would have accepted the dedication thereof at some future time, (although from the construction of the ground and the apparent impracticability of using it as a street, it is improbable,) and it would be proper for the commissioners, in determining the value of the property, to take the fact of such dedication and the probability of its future acceptance into consideration, and if, in view of all the facts and circumstances, it was thereby depreciated, the amount of the depreciation might be properly deducted from what would otherwise have been the fair, full value thereof, including, in such valuation, the buildings and improvements thereon. The rule which prohibits an allowance for buildings erected on land laid down, as the site of streets, on the village map of Brooklyn, as declared in the *Matter of Furman street*, (17 *Wend.* 649,) does not apply to the proceeding. That is only applicable when the land is taken for a street ; and until that time arrived, as was stated by Judge Bronson in his opinion in that case, it remained the property of the proprietor, " with the undoubted right to use it in any way that his interest or pleasure might suggest, with the single admonition, that if he made any erections on the site of the street he should not charge the expense to his neighbor, when it was opened."

Upon the application of the above principles to this pro-

ceeding, it is evident that the commissioners have erred in allowing a nominal compensation only to the owners of the property taken, and the order, at the special term, confirming their report must be reversed, with $10 costs on each appeal, to the appellants. An order must be entered to that effect, and denying the motion for confirmation, and referring it back to the same commissioners, for revision and correction, in accordance with the above principles, with liberty to correct the report, in any other particular, if they shall deem that course either necessary or proper.

The costs of the appellants, $10 on each appeal, should be allowed to them, under the circumstances.

[KINGS GENERAL TERM, February 11, 1867. *Lott, J. F. Barnard* and *Gilbert*, Justices.]